IN THE SUPREME COURT OF NORTH CAROLINA

2021-NCSC-47

No. 262A20

Filed 23 April 2021

IN THE MATTER OF: J.E., F.E., D.E.

Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) from an order entered on 4 March 2020 by Judge Charlie Brown in District Court, Rowan County. This matter was calendared for argument in the Supreme Court on 19 March 2021 but determined on the record and briefs without oral argument pursuant to Rule 30(f) of the North Carolina Rules of Appellate Procedure.

*Jane R. Thompson for petitioner-appellee Rowan County Department of Social Services.*

*Alston & Bird, LLP, by Caitlin C. Van Hoy, for appellee Guardian ad Litem.*

*Anné C. Wright for respondent-appellant father.*

HUDSON, Justice.

¶ 1　　Respondent, the father of the minor juveniles J.E. (Jeff)[1], F.E. (Fred), and D.E. (Dan), appeals from the trial court's order terminating his parental rights.[2] Upon careful review of the record and arguments, we affirm.

## I.　Factual and Procedural Background

---

[1] Pseudonyms are used to protect the juveniles' identities and for ease of reading.

[2] The order also terminates the parental rights of the children's mother. However, she is not a party to this appeal.

On 8 December 2017, the Rowan County Department of Social Services (DSS) filed a juvenile petition alleging that Jeff, Fred, and Dan were neglected and dependent juveniles and obtained nonsecure custody of the children. The juvenile petition also contained allegations concerning the children's mother's oldest child, D.P. (Doug).[3] The petition alleged that DSS received a report on 6 December 2017 with concerns regarding the welfare and safety of Doug and Fred after the parents left them in the care of a neighbor in Rowan County on 5 December 2017 to attend a court date in Wilmington. The parents later called the neighbor asking the neighbor to care for the children overnight, and the neighbor called law enforcement on 6 December 2017 reporting that he could not reach the parents and could no longer care for the children. It was reported that law enforcement responded and found Doug and Fred present at the home where the family had been squatting, which was "in very poor condition." Specifically, the home smelled strongly of feces and rotten food; there were dirty diapers, coke bottles containing a yellow bubbly substance, sticky carpet, and visible mold throughout the home; drug paraphernalia was in plain sight; and a 55-gallon drum with fermenting mash was located in the kitchen. It was also reported that Doug and Fred smelled strongly of urine, body odor, and filth; Doug's hair was "severely cut short in the front"; and Fred suffered from severe diaper rash requiring an antibiotic and had numerous scratches on his neck and torso.

---

[3] Respondent is not Doug's father, and therefore this appeal does not concern Doug.

¶ 3      The petition further alleged that the parents returned from Wilmington on 7 December 2017, dropped Jeff and Dan off with their aunt, and told the aunt that they were concerned they would be arrested for child abuse and did not have money to make bond; the parents told a social worker that they were both suffering from mental health issues, the mother was severely depressed, respondent's health was declining, and they were struggling to care for the four children; the parents had acknowledged their house was a "wreck"; the parents indicated they did not plan to return to Rowan County until they could afford to make bond; the mother had previously been hospitalized for mental health issues and had been diagnosed with bipolar disorder and post-traumatic stress disorder; respondent is hostile and aggressive with authority figures and bullies and threatens people to get what he wants; and both parents have drug issues.

¶ 4      The petition also indicated the parents had a significant history with child protective services in Rowan County, Anson County, and Union County and had previously faced criminal charges. The petition provided that DSS had received nine reports since the family moved to Rowan County in June 2016 with concerns including: lack of supervision; failure to take Doug to counseling and to provide him with proper schooling; domestic violence between the parents in front of the children; safety hazards for the children at the home; the parents driving without licenses; and failure to follow up with critical medical appointments for the children. The petition

also alleged the parents were charged with misdemeanor child abuse, possession of marijuana, and possession of drug paraphernalia in May 2016; respondent was additionally charged with traffic offenses; and respondent was on probation after pleading guilty to "several offenses" in July 2017. Lastly, the petition alleged the children have been negatively impacted by their unsafe, unhealthy, and unstable home environment.

¶ 5        An Out of Home Family Services Agreement (case plan) was developed for and signed by respondent at a Child and Family Team Meeting on 23 February 2018. The case plan included requirements for respondent to address his substance abuse and mental health issues, complete parenting education, obtain and maintain appropriate housing, and demonstrate the ability to care for the children and meet their needs.

¶ 6        After the hearing on the juvenile petition was continued on 1 March 2018 and 12 April 2018, the juvenile petition came on for hearing on 17 May 2018. On that date, the parents stipulated that the children were neglected and dependent juveniles based on the allegations in the juvenile petition. As part of the stipulations, respondent again agreed to terms and conditions consistent with his case plan.

¶ 7        On 3 July 2018, an adjudication and disposition order was entered adjudicating the children to be neglected and dependent juveniles based upon the parents' stipulations. In addition to the stipulations, the trial court found that the parents were on probation after pleading guilty to child abuse charges in January 2018, and

respondent was charged with driving while license revoked on 22 February 2018. The trial court's findings also acknowledged respondent's entry into the case plan and detailed his participation in initial assessments which resulted in recommendations for services, but the trial court found that respondent had either refused or had yet to follow through with recommended services and DSS could not confirm respondent's participation in services for which respondent reported participation. The trial court continued custody of the children with DSS, ordered that the initial permanent plan be set at the first permanency planning review hearing, and allowed the parents supervised visitation "at a minimum of twice per month for two hours." Furthermore, in accordance with respondent's case plan, the trial court ordered respondent to abide by the conditions of his probation/parole; follow all recommendations from his substance abuse, mental health, and any psychiatric or psychological assessments; obtain and maintain safe, sanitary, and stable housing and provide proof of such to DSS and the guardian ad litem (GAL); make diligent efforts to obtain and/or maintain stable employment and provide proof of such to DSS and the GAL; participate in medication management services and take medication as prescribed; submit to random drug screens; participate in recommended services for the children; enroll in and complete a parenting education program approved by DSS; and sign releases of information to DSS, the GAL, and the trial court.

¶ 8        The matter came on for the first permanency planning review hearing on 13

September 2018. In an order entered on 31 October 2018, the trial court found respondent had been arrested on 18 June 2018 for three counts of misdemeanor probation violation and was presently incarcerated. DSS retained custody of the children, and the trial court set the primary permanent plan for the children as reunification with a secondary plan of adoption. Respondent's visitation was not changed.

¶ 9 After the matter came back on for another permanency planning review hearing on 24 January 2019, the trial court entered an order on 21 March 2019 that changed the primary permanent plan for the children to adoption with a secondary plan of reunification. The trial court found respondent had not made any further progress on his case plan and had been absconding or incarcerated for much of the case.

¶ 10 On 2 July 2019, DSS filed a petition to terminate the parents' parental rights to Jeff, Fred, and Dan. DSS alleged that grounds existed to terminate respondent's parental rights for neglect pursuant to N.C.G.S. § 7B-1111(a)(1) and for failure to make reasonable progress pursuant to N.C.G.S. § 7B-1111(a)(2). On 15 August 2019, respondent filed a response to the petition opposing the termination of his parental rights.

¶ 11 After continuances on 26 September 2019 and 7 November 2019, the termination petition was heard on 2 December 2019 after the trial court denied the

parents' motions to further continue the matter. On 4 March 2020, the trial court entered an order terminating respondent's and the mother's parental rights. The trial court concluded that both grounds alleged in the petition existed to terminate respondent's parental rights, *see* N.C.G.S. § 7B-1111(a)(1)–(2) (2019), and that it was in the best interests of the children to terminate respondent's parental rights. Respondent appeals.

## II. Analysis

### A. Motion to Continue

¶ 12    Respondent first argues the trial court erred in denying his motion to continue the termination hearing on 2 December 2019 and proceeding in his absence. "Ordinarily, a motion to continue is addressed to the discretion of the trial court, and absent a gross abuse of that discretion, the trial court's ruling is not subject to review." *In re A.L.S.*, 374 N.C. 515, 516–17 (2020) (quoting *State v. Walls*, 342 N.C. 1, 24 (1995)). "However, if 'a motion to continue is based on a constitutional right, then the motion presents a question of law which is fully reviewable on appeal.' " *In re S.M.*, 375 N.C. 673, 679 (2020) (quoting *State v. Jones*, 342 N.C. 523, 530–31 (1996)).

¶ 13    On appeal, respondent contends the denial of his motion to continue deprived him of a fair hearing under the circumstances. Respondent seeks de novo review arguing that he was deprived of a fundamentally fair hearing in violation of his right

to due process. He emphasizes his participation in the juvenile proceedings up to the termination hearing and argues, "[c]onsidering the fact that [he] had consistently participated in the proceedings prior to the termination hearing and the likelihood that he did not know the hearing was taking place, he had a critical need for procedural protection and his attorney's motion to continue should have been granted."

¶ 14        However, there is no indication in the record that respondent's counsel moved to continue the termination hearing in order to protect respondent's constitutional rights. There is no mention of the need to continue due to a lack of notice or in order to ensure due process. Although the transcript of the proceedings is incomplete, the transcript shows that upon inquiry from the trial court respondent's counsel confirmed that his only objection to proceeding with the termination hearing was respondent's absence. A parent's absence from termination proceedings does not itself amount to a violation of due process. *See In re C.M.P.*, 254 N.C. App. 647, 652 (2017) ("[T]his court has held that a parent's due process rights are not violated when parental rights are terminated at a hearing at which the parent is not present."); *In re Murphy*, 105 N.C. App. 651, 656–57 (holding a parent's due process rights were not violated when the termination hearing was conducted in the parent's absence), *aff'd per curiam*, 332 N.C. 663 (1992). Accordingly, respondent has waived any argument that the denial of the motion to continue violated his constitutional rights, and we

review solely for an abuse of discretion. *In re S.M.*, 375 N.C. at 679 (citing *In re A.L.S.*, 374 N.C. at 516–17).

> "Abuse of discretion results where the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision." *State v. Hennis*, 323 N.C. 279, 285, 372 S.E.2d 523, 527 (1988). Moreover, "[r]egardless of whether the motion raises a constitutional issue or not, a denial of a motion to continue is only grounds for a new trial when defendant shows both that the denial was erroneous, and that he suffered prejudice as a result of the error." *Walls*, 342 N.C. at 24–25, 463 S.E.2d at 748.

*In re A.L.S.*, 374 N.C. at 517.

¶ 15     In reviewing for an abuse of discretion, we are guided by the Juvenile Code, which provides that "[c]ontinuances that extend beyond 90 days after the initial petition shall be granted only in extraordinary circumstances when necessary for the proper administration of justice." N.C.G.S. § 7B-1109(d) (2019). "Furthermore, '[c]ontinuances are not favored and the party seeking a continuance has the burden of showing sufficient grounds for it. The chief consideration is whether granting or denying a continuance will further substantial justice.' " *In re S.M.*, 375 N.C. at 680 (alteration in original) (quoting *In re D.W.*, 202 N.C. App. 624, 627 (2010)).

¶ 16     The termination petition was filed in this case on 2 July 2019, and respondent was served with the petition in person in court on 11 July 2019. Prior to the termination petition being called for hearing on 2 December 2019, the termination hearing had been continued twice upon motions of the parents on 26 September 2019

and 7 November 2019 due to the parents' absences. At the time of the last continuance on 7 November 2019, counsel for both parents agreed to the special setting of the termination hearing on 2 December 2019. Respondent, who was incarcerated at the time, was transported to court for the hearing on 7 November 2019 but was not brought into the courtroom because the matter was continued.

¶ 17    When the termination petition came on for hearing on 2 December 2019, exactly five months after the petition was filed, counsel for each parent was present, but neither parent was present in court. Based on the trial court's findings of fact, we are satisfied the trial court did not abuse its discretion in determining respondent's unexplained absence did not amount to an extraordinary circumstance, as required by N.C.G.S. § 7B-1109(d), to merit continuing the termination hearing further beyond the 90-day timeframe set forth in the Juvenile Code. Respondent's attempt on appeal to explain his absence by asserting it was "likely" he did not know the hearing date is not convincing. Respondent never affirmatively asserts he did not have notice of the hearing. Furthermore, respondent does not contest the trial court's findings regarding efforts by counsel and DSS to contact him, and he offers no explanation for his lack of contact with his counsel and DSS despite him knowing that the termination hearing was pending.

¶ 18    Additionally, respondent has failed to argue, let alone establish, how he was prejudiced by the trial court's denial of his motion to continue. Given respondent's

counsel's advocacy on behalf of respondent at the termination hearing and the unchallenged findings of fact supporting the termination of his parental rights discussed below, we believe it is unlikely that the result of the termination proceedings would have been different had the hearing been continued.

¶ 19        Respondent has failed to establish that the trial court abused its discretion in denying his motion to continue and that he was prejudiced thereby. Accordingly, we overrule respondent's argument that the trial court erred in denying any further continuance of the termination proceedings.

**B. Grounds to Terminate Parental Rights**

¶ 20        Respondent also challenges the trial court's adjudication of the existence of grounds to terminate his parental rights pursuant to N.C.G.S. § 7B-1111(a)(1) and (2). The Juvenile Code provides for a two-stage process for the termination of parental rights: adjudication and disposition. N.C.G.S. §§ 7B-1109, -1110 (2019). At the adjudication stage, the petitioner bears the burden of proving by "clear, cogent, and convincing evidence" that one or more grounds for termination exists under N.C.G.S. § 7B-1111(a). N.C.G.S. § 7B-1109(e), (f). "[A]n adjudication of any single ground in N.C.G.S. § 7B-1111(a) is sufficient to support a termination of parental rights." *In re E.H.P.*, 372 N.C. 388, 395 (2019).

¶ 21        "We review a trial court's adjudication under N.C.G.S. § 7B-1111 'to determine whether the findings are supported by clear, cogent and convincing evidence and the

findings support the conclusions of law.' " *Id.* at 392 (quoting *In re Montgomery*, 311 N.C. 101, 111 (1984)). "Findings of fact not challenged by respondent are deemed supported by competent evidence and are binding on appeal. Moreover, we review only those findings necessary to support the trial court's determination that grounds existed to terminate respondent's parental rights." *In re T.N.H.*, 372 N.C. 403, 407 (2019) (citations omitted). "The trial court's conclusions of law are reviewed de novo." *In re M.C.*, 374 N.C. 882, 886 (2020).

¶ 22        A trial court may terminate parental rights for neglect if it concludes the parent has neglected the juvenile within the meaning of N.C.G.S. § 7B-101. N.C.G.S. § 7B-1111(a)(1). A neglected juvenile is defined as one "whose parent, guardian, custodian, or caretaker does not provide proper care, supervision, or discipline; . . . or who lives in an environment injurious to the juvenile's welfare." N.C.G.S. § 7B-101(15) (2019). As we have recently explained:

> Termination of parental rights based upon this statutory ground requires a showing of neglect at the time of the termination hearing or, if the child has been separated from the parent for a long period of time, there must be a showing of a likelihood of future neglect by the parent. When determining whether such future neglect is likely, the district court must consider evidence of changed circumstances occurring between the period of past neglect and the time of the termination hearing.

*In re R.L.D.*, 375 N.C. 838, 841 (2020) (cleaned up).

¶ 23        In this case, the trial court found that the children were previously adjudicated

to be neglected and dependent juveniles. It also issued findings that detailed DSS's history of involvement with the family, the circumstances leading to the prior adjudication, the requirements of respondent's case plan that he agreed to and was ordered to complete to remedy those conditions, and respondent's failure to comply with the requirements of his case plan and to remain in contact with DSS. The trial court ultimately determined "[t]he probability of a repetition of neglect of the juveniles if returned to the home or care of [the mother] and [respondent] is very high" and concluded grounds existed to terminate respondent's parental rights for neglect.

¶ 24        Respondent now argues the trial court's conclusion that grounds existed to terminate his parental rights for neglect was "not supported by competent and sufficient findings of fact." Respondent challenges very few of the trial court's findings and instead argues the findings do not account for his circumstances at the time of the termination hearing and do not support the trial court's determination that there was a very high probability of a repetition of neglect. We disagree.

¶ 25        The trial court made the following relevant findings of fact:

> 10. In his written answer to the TPR petition, [respondent] admits that he and [the mother] have significant child protective services history in Rowan, Anson, and Union counties. He admits that nine reports were made to [DSS] beginning in June 2016, the month that he and [the mother] and the children moved to Rowan County from Anson County. He admits that the [nine] reports contained concerns including a lack of proper supervision, failure of

the parents to provide proper medical attention to the children, exposure to domestic violence, untreated substance abuse and mental health issues, and an injurious, unstable, and unsanitary living environment for the children. . . .

. . . .

12. On December 6, 2017, [the parents] left the county to attend a court date in Wilmington, NC. They left two of the four children with a neighbor. The neighbor called law enforcement stating that he could not get in touch with the parents, and he could no longer care for the children. [The parents'] home was in very poor condition. [Fred] was born prematurely and addicted to marijuana. He had multiple bruises and scratches and had severe diaper rash. Both parents signed a stipulation document at adjudication agreeing that the allegations were true. The children were adjudicated neglected.

13. The parents were ordered to complete substance abuse treatment and parenting education, to obtain appropriate housing, to participate in therapy for the children, to complete mental health treatment, and to comply with [DSS]. Neither parent has met any of those requirements to date. Both parents admitted to [DSS] that they have mental health issues . . . .

. . . .

15. [The parents] plead[ed] guilty to child abuse charges in January 2018 and were both placed on probation. [The parents'] relationship was on and off during the case. [Respondent] was an emotional mess and obsessive about [the mother]. . . . [He] often made statements to social workers that made [DSS] question his veracity and/or lucidity. . . . [He] would write fairy tales to be given to the children. . . . [DSS] reviewed the writings and did not find them to be appropriate for the children. [Respondent and the mother] moved around from place to place and had no stable housing. . . .

16. By May 2018, neither parent was compliant with [DSS]. [Respondent] was living out of his car. . . . [He] had some visits with the children [between December 2017 and May 2018]. He would often show up late to visits[,] . . . or he would no show to visits. He would sometimes come to visits dirty and had to use [DSS's] restroom to clean himself up. [Respondent] was engaged with the children during visits, but he would cry and would often be very tearful and emotional.

17. [A new social worker] took over the case in May 2018 but did not have any communication with the parents until July 2018. Several attempts were made to locate [the parents]. . . . [Respondent] was arrested in June 2018. . . .

. . . .

19. Around the time of the January 24, 2019 court hearing, [respondent] agreed that he and [the mother] had substance abuse and mental health issues. He said he did not have a plan to reengage in a relationship with [the mother] and wanted to get his life together. [Respondent] no showed to a scheduled meeting at [DSS] on April 21, 2019. In July 2019, [respondent] contacted [the social worker] wanting to reengage in services.

. . . .

21. [A new social worker] took over the case in August 2019 and has made efforts to contact and locate [the parents] with no success. [The social worker] contacted all phone numbers listed for the parents and sent out letters to the parents' attorneys. All phone numbers were invalid. [The social worker] called [respondent's] employer on September 23, 2019 and October 15, 2019. On September 23, 2019, [respondent's] employer stated that [respondent] was still technically employed, but he had not spoken with [respondent] in two weeks. [The social worker] reached out to the Mecklenburg County Police Department and received documentation that [respondent] had been arrested twice. [The social worker] has been unable to have

any contact with either parent.

22. [Respondent] was charged with vehicle theft on August 30, 2019, and on September 3, 2019, he was arrested for larceny of a motor vehicle. [The mother] was with him at the time[ ] . . . . [Respondent] posted bail but was arrested again on November 3, 2019 for drug paraphernalia possession and bonded out on November 14, 2019. Neither parent has made any effort to make contact with the agency or the foster parents in regards to the well-being of their children.

23. . . . [The parents] are not in a position to care for the juveniles due to their lack of responsible decision making, incarcerations, mental health issues, substance abuse issues, positive drug screens, parenting issues, failure to communicate consistently, and lack of overall stability. Both parents have expressed their plans and desires on multiple occasions to get themselves together, but each has failed to follow through with services ordered by the court to help them reach their goals.

24. The barriers to a safe reunification with either parent are numerous and include the fact that both parents continue to have unaddressed substance abuse and mental health issues, they have been frequently incarcerated throughout the life of this case, they have not maintained stable housing or employment, and they have not visited regularly with the children or even checked on the children's well-being.

These findings are unchallenged by respondent and are binding on appeal. *See In re T.N.H.*, 372 N.C. at 407.

The above unchallenged findings of fact detail the historical facts of the case and demonstrate that, at the time of the termination hearing, respondent had failed to complete the requirements of his case plan designed to address the issues that

previously resulted in the adjudication of the children as neglected juveniles. The findings also make clear that respondent's incarceration was not the sole evidence of neglect, but that his incarceration was considered along with his failure to complete his case plan requirements for substance abuse, mental health, and housing, and his failure to regularly visit with the children or check on their wellbeing. Moreover, respondent was not incarcerated for the entirety of the case, and his incarceration for much of the case was the result of his probation violations and criminal activity that continued up until the month before the termination hearing, which itself is evidence supporting a likelihood of repeated neglect.

¶ 27      Upon review of the termination order, we are satisfied that the unchallenged findings which establish a lack of changed circumstances fully support the trial court's determination that there was very high probability of a repetition of neglect if the children were returned to respondent's care. *See In re M.A.*, 374 N.C. 865, 870 (2020) ("A parent's failure to make progress in completing a case plan is indicative of a likelihood of future neglect.") (quoting *In re M.J.S.M.*, 257 N.C. App. 633, 637 (2018)); *In re J.M.J.-J.*, 374 N.C. 553, 566 (2020) (upholding termination based on neglect where "the trial court's findings of fact demonstrate that respondent's circumstances had not changed so as to render him fit to care for [the child] at the time of the termination hearing"). In turn, the combination of the trial court's finding that the children were previously adjudicated to be neglected juveniles and its

determination that there was very high probability of future neglect supports the conclusion that grounds existed to terminate respondent's parental rights to the children for neglect under N.C.G.S. § 7B-1111(a)(1).

### III.    Conclusion

Having held the trial court did not abuse its discretion in denying respondent's counsel's motion to continue the termination hearing and did not err in adjudicating grounds to terminate respondent's parental rights, and because respondent does not challenge the trial court's best interests determination at the dispositional stage, we affirm the trial court's order terminating respondent's parental rights to Jeff, Fred, and Dan.

AFFIRMED.